Thank you, Your Honor. I'd like to reserve two minutes for rebuttal. May it please the Court, I'm Thomas John Trigo from Petitioner. The immigration judge in this case, Cherry Picks, strung the facts to insulate an adverse credibility finding. On page 45, first paragraph, lines 4 through 11, the first fact that the I.J. Cherry Picks is that the petitioner orally testified that he went personally with the petition signed by the workers. However, in the petitioner's asylum statement, does not state he went personally with the signed petition. This is on page 253, lines 15 through 18, and on 604, last paragraph, and page 251, lines 16 through 18, and page 315, lines 12 through 14. This is an omission. Under Imon v. Barr, Fed 3rd, 1058, Act 1067, 9th Circuit, 2020, the Court held that generally, omissions are less probative of credibility than inconsistencies created by direct contradictions in evidence and testimony. And it's also well established in this Court that the mere omission of a detail is insufficient to uphold an adverse credibility finding. Moreover, under Lopez v. Reyes, I.N.S. 79, Fed 3rd, 908, Act 911, 9th Circuit, 1996, the Court held an applicant's testimony is not per se lacking in credibility simply because it includes details that are not set forth in the asylum application. Here, what if the immigration judge would have considered the holdings in Imon v. Barr? Thus, the omitted fact that the petitioner personally delivered the petition would not be a negative factor to consider to insulate an adverse credibility finding. The I.J. pointed to some other omissions that maybe were more significant, like the, I believe the fact that he was subjected to electric shocks at the police station was not in his initial application, and whether he gave the petition to the, who he gave the petition to, whether it was the Communist Party committee, I think that was not in there. Okay, so going on to the other one, giving it to a party. So on that one, on that next issue, which was my next issue, which leads me to my next issue, that the petitioner's testimony was vague and evasive. That's on page 45 to 47 of the I.J.'s decision. On page 45, second paragraph, the I.J. states he was going with a petition to the Communist Party committee that is in charge of the whole thing. And it turns out the Communist Party committee was not really a separate entity with the Communist Party, but really more like a department of the company. On page 251, lines 16 through 25, the I.J.'s line of questioning, who did you send this petition to? Petitioner states, we gave it to the Communist Party of our company. Then on page 252, lines 12 through 22, and page 265, lines 20 through 25, and page 257, lines 11 through 13 and 23, and page 258, lines 5 through 6, both the I.J. and government counsel assume the fact that the Communist Party is in the same city, but a different location and a different entity than the company. Then on page 258, lines 21 through 25, and page 259, lines 9 through 13, counsel for the petitioner continues his direct asking petition, did you file a petition with the company for the Communist Party? Petitioner replies on page 258, lines 25, and page 259, lines 9 through 13, it was the Communist Party that was under the auspice of the company and explains further that the system in the United States is different than China. The Communist Party committee is a department inside the company. If the I.J. would have asked where the Communist Party committee is located instead of stating to the petitioner that the Communist Party is in the same city, where the factory is, petitioner's response would be clear and direct. Thus, this is a fact that I.J. assumes in a leading question that the petitioner could only respond yes to and should not be used to insulate an adverse credibility finding. So, let's see if I understand it correctly. In China, being a communist country, the Communist Party is like the HR department, except that it reports directly to the party instead of to the CEO or whoever in the company. Is that right? Correct. Correct. So, it's like bringing it up to HR, except they have outside connections, not just superiors in the company. Correct, John. Correct. And then that kind of leads me to the other question that you talked about, which was the shocking of the baton. He actually states in his first two statements, his asylum statements, his original one he was shocked, and then the second one he was shocked. The third one that was rewritten was to explain more of how the corruption was learned of, as well as how the actual director profited from it. So, his focus on the redraft, on the third redraft, was to focus more on the corruption and explain more so that this way it could be laid out. I'm confused about something here. Shock can mean a couple of things. One is when you walk across the rug on a very dry, wintry day and you touch the doorknob and you get a shock. And, of course, it can be more severe. Another is when you discover something about somebody and I'm shocked, shocked. What are we talking about? All right, so we're talking when he was detained after he was trying to organize 50 employees to go protest. The police arrested him, took him into detention, and on the third day, he says in his first two asylum statements, that he was thrown water on him and there was an electric baton and he was actually shocked. But if you see the first asylum statement, it only really does describe in detail about the corruption. And there was issues because the first one didn't have an actual translation to it. I would think it would be kind of unforgettable if somebody used a cattle prod on another individual. So why wouldn't you mention that every time you were asked about what bad things happened to you? Right, I understand. I think when he was rewriting the last version of this, because there was three versions of his statement, he was focusing more on explaining the corruption and not so much the harm because the harm was established in the first two statements. So he goes through kind of explaining all the harm again, but the first second statement, which he wrote, only explains the harm he suffered while in detention, the three times he was interrogated and how he was mistreated. So, you know, he initially stated, if he actually then doesn't include it in the third, he's not embellishing. So it's not like he forgot about it, he testified to it. So when he added in the other two statements initially, and then the third one, which he was describing more of the corruption, he was focusing on that in the writing, which leads me to the next issue, which was they talk about his job description and about, you know, what is it? Petitioner testifies, describes his position as deputy manager, but his written statement states he is an operating director. Under SESTA Review Holder 590, Fed 3rd, 1034, at 1041 and 1042, 9th Circuit, 2010, an adverse credibility determination on assignment plans under the Real ID Act must be based on the totality of the circumstances. The immigration should consider and address as necessary or otherwise appropriate relevant evidence that tends to contravene that undermines credibility. Citing the Real ID Act, Section 101, 83, 8 U.S.C., Section 1158B, small b's, I, capital B, triple I. Additionally, in evaluating inconsistencies, the relevant circumstances that an I.J. should consider includes petitioner's explanation for perceived inconsistency, citing SOTO Allegrate 555, Fed 3rd, 1091, and any other evidence that sheds light on whether there is, in fact, an inconsistency at all. Before you run out of time, could you address the non-appearance of Mr. Lee's son? Because Mr. Lee offered an explanation for that that seemed somewhat reasonable, but why was the immigration judge compelled to accept that explanation? Here is the issue. We had put in a witness list saying he was going to testify. Then the client comes back and says that his son is being represented by counsel. So if you actually look at 510 of the record, and the son's literally, the letter to his father, which is literally three pages long, is almost detailing like an asylum statement, like he's going to be seeking asylum because he's witnessing the abuse in the country. So at this point, we can't question the client's son or inquire because he's represented by counsel. So at this point, our hands are tied. So, you know, at that point, and even the client... Couldn't an adverse inference be drawn from the fact that the son, who obviously had helpful information for his father's case, enough to present that detailed written statement, then refused to come when he was present here in the United States? I would agree with you, yes. However, in this situation, he sought counsel, and the counsel told his son not to testify. And that's what was expressed on the record by the actual father who was... What would be the plausible reason for his declining to testify, other than that he might end up testifying, for example, falsely? What's the alternative inference, other than that he would testify falsely, for why he would refuse? Okay, you're asking me to speculate on why the attorney... Well, there has to be at least another plausible explanation to say he was competitively accepted. Right, which at least means to say perception is reality, assumption is the mother of all mistakes, and somewhere between those two lies the truth. So in this situation, it looks like the son would be, should be testifying. That's the perception. But the assumption is that the judge is expecting him to testify. But we don't know. The truth is, another attorney probably had started filing his asylum application. If he testifies, anything that missteps could be used against the son himself to deny his asylum claim. Because the judge on the government attorney could then, once the door is open, ask him, are you applying for asylum? What's your basis? And then, so as attorneys protect their clients, they're saying do not testify. So that would be the plausible explanation under that perception, and then finding out this is the reality of it. So... Thank you, Mr. Trigo. We've taken you past your time, but we'll give you a couple minutes for rebuttal. Thank you. Mr. Williams. Good morning. This is John Williams on behalf of the government. In this immigration case, the immigration judge reviewed the totality of the circumstances. Excuse me, counsel. I have two areas that look to me like they were really important to the immigration judge, and I have questions about them. One is exactly what form alleged corruption took, and the other is the non-appearance of the son. Let me ask you about each of them. First of all, on the scheme, it looked to me like the I.J. just didn't understand it, so he thought that this fellow Lee was giving him gobbledygook. That's the way it read to me.  You buy, say, 1,000 gallons of petroleum. It's 5% water, so you've got 950 gallons of usable petroleum. If you falsely put on the books that it was 25% water, then on the books you've got 750 gallons of petroleum, but since it was 5%, you've actually got 950. So the director sells the 200 gallons that's not on the books for his own account. That seems like a simple scheme to me, and I couldn't figure out why the I.J. had trouble with it. It seems like just the sort of thing that a whistleblower might get in trouble for reporting to because it's obviously corrupt, and I want you to explain what was confusing about it, and then I'll get to the son. I have a question about that, too. Why did the I.J. have trouble understanding the scheme? Your Honor, I don't know. I'm asking you to point to testimony that looks like gobbledygook because that's what the I.J. basically said it was. Well, you know, the judge, the immigration judge, was looking for, you know, specifics as to why the petitioner would have been persecuted or feared persecution in this case. Yeah, well, to get in trouble in the United States if you report your boss for his misconduct, that's a dangerous thing to do everywhere. So he's looking at did particular things take place. So, for instance, what was his specific title? Was it deputy manager, or was he actually a director? The petitioner stated that if he was a director, he would be a member of the Communist Party. I would imagine his title was in Chinese. And so, you know. I mean, I doubt if they used the English word manager or the English word director in China. I suspect they have Chinese words. Well, I don't know, except that was a point of clarification. Because, in this instance, the petitioner made a point that those at the director level are members of the Communist Party. So this was something that went to the heart of the claim. Can I ask about that? Because he said the deputies didn't have to be members of the party. And he said something about what he called official positions. This is at 255 of the record, have to be members. But I didn't see where he tied that specifically to the director title, so as to make that distinction in title so important. Where is that? He testified at administrative record, page 220 and 235. And then at page 603 and 703 of his statement, he went back and forth as to whether or not he was a manager or a director. He also, you know, there was the position and then the member, whether he was a member of the Communist Party or whether he was not a member of the Communist Party. I thought he was consistent that he was not a party member. He was consistent that he wasn't a party member. However, he was not consistent with regard to whether or not his position and the fact that if he was a director, he would be a member of the party. And if he wasn't, he wasn't. Oh, I had just read it to mean, no, you have to be one rank higher than I was to have to be a communist. Well, that's possible. Is there another way to read it? It seemed clear to me. Well, yes, you have to be one rank. Is he one rank or is he not one rank? And so as he made this complaint, he also, you know, he had an opportunity to explain these things. And we've gone away from Judge Kleinfeld's original question, which is what do we do with the fact that it seems pretty clear that the IJ just simply did not intellectually comprehend what he was saying about the fraud. It seems, let me finish the question first. It seems pretty clear to me, my reading was the same as Judge Kleinfeld's, that he seemed not to understand how a paper entry could result in the sort of fraud. And it's, in the way that Judge Kleinfeld laid out, it's easy that if you say the water, the oil coming in is 25%, you have an ability to pull out some and sell it on the side and the books account for less. It seemed to make perfect sense. The IJ just did not comprehend it. What do we do at this point? Do we just have to send it back for a fresh look at credibility? Because this is the major factor, it seems, in the credibility determination. And it doesn't seem to hold water, no pun intended. Well, I would suggest that the court doesn't need to send it back. As you look at the totality of the circumstances in this case, there was a negative demeanor finding by the immigration judge. There was the implausible nature of the claim. There was the inconsistencies and there were the omissions. I would look like he'd look terrible because he'd been up all night. He gave a good explanation for why he'd look bad and sound confused. And I guess the other thing that's been on my mind, and I don't want to run out of time on it, is the son, which links to how bad he looked. On the son, it seemed really important to the IJ that his son had not testified. And my first thought on that was, what's so important about this son? How many children know all about what's going on with their parents at work? All they would ordinarily know is hearsay from the parents. And the judge gets what the parent has to say. And the second thing that occurred to me is he gave a good reason why his son wouldn't testify. Number one, the son's lawyer told him not to, and I could see plenty of good reason. It's just like anybody who's vulnerable, a lawyer's likely to tell them, don't expose yourself to what could be very damaging in cross-examination. And number two, the son was really mad at the father because the son said, I've been here working an emailing job for ten years, it's tough, I feel sorry for himself. And the son basically said, oh, yeah, what about mom? And he was really mad that the father let the mother get ten years older all alone in China while he was in the United States. It seemed like good reasons why, number one, the son didn't show up, because they were mad at each other, and number two, why the only reason it was important that the son show up is that the IJ said, I want the son to show up. I couldn't see what the importance of the son was except for that. Well, I think you nailed it head-on. The immigration judge in this case specifically continued the case for years because he recognized that the son was arriving in the country, apparently, legally. Now a student visa. A student visa. Assuming he was still a student and that wasn't an area of vulnerability on the cross that his lawyer didn't want him to testify about. Well, and that leads to speculation because there's no document from some outside counsel that this son was advised. The petitioner had a long description in the area that he told them. The IJ found that the son's lawyer really had told them that the son had a lawyer. Well, the judge asked the petitioner, where's your son? I continued this case for years because your son submitted a document stating that he corroborated these events, and just so your son could come testify, and then on the eve you tell me he's not here because you all had an argument and he said that he was upset about his mother. The father of the petitioner leaving his mother there, as Your Honor had stated. So for the immigration judge, this was implausible, and add to it that the wife works for the same company. There's been no harm to the wife, and she's been working there for years. And so that seemed very important to the IJ, and I'm wondering, was there anything in the record that indicated that you couldn't continue to have a job at a company if your spouse had gotten in trouble there? I mean, I can imagine that maybe in an authoritarian regime, like they would punish family members of people who were in trouble, but it doesn't seem obvious that they necessarily would. So wasn't the IJ just kind of speculating there? Well, there was nothing in the record, but you have to imagine that this petitioner has described this scheme and that he was shocked by a baton that these persecutions happen, that he fears persecution if he returns, that he can't go back, and his wife is working for the same company, and no harm has taken place. Different division, was it? Different division, same company. So these things have taken place. Prior to ALOM, we would have had to uphold this, because we used to follow the rule that if there was one valid ground for an adverse credibility determination, then it would stand. But they overruled that in ALOM, and said we have to look at the totality of the circumstances when some of the grounds are bad. Here it seems you've got many grounds to choose from to support the credibility determination. But what seems like the major factor is, in my mind, questionable. So under ALOM, are we supposed to reassess this credibility determination ourselves, or do we send it back to the agency to reweigh it, saying this one is bad, now look at the rest and see if you think it's enough? Or do we do that? So if a case is needs to be, evidence needs to be reweighed, it would be sent back. But here, as your Honor has stated, there is a negative demeanor, implausible nature, omissions, inconsistencies in both the immigration judge and the board that looked at the totality of the circumstances and found that they could not believe what had taken place. But those aren't all really independent factors. I mean, because the demeanor finding was based on, in large part, on the IJ's conclusion that Mr. Lee was evasive. And he thought he was evasive because he said he was giving answers to how the scheme worked that didn't make sense. But as I think all three of us have suggested, it seems like those answers did make sense. So I guess, aren't those grounds all really derivative of, or all infected by the IJ's failure to appreciate what the scheme was that was being described? Well, no, it isn't, Your Honor, because the immigration judge had the ability, as this court has recognized, to sit there and watch over the full period of this proceeding. And what he concluded was, and laid out was, throughout the proceedings, it didn't appear that the petitioner was telling the truth. So in this instance, demeanor alone could support the adverse credibility determination in this court finding that the petitioner lacked credibility. And so I would ask the court to look at the factors individually, collectively, and look at the totality of the circumstances and, you know, recognize that, given the totality of the circumstances, the agency reasonably concluded that the petitioner was not worthy of belief in this instance. He was not worthy of belief. Substantial evidence in the record supports the agency's decision, and I would ask that this court deny the petition for review. Thank you, Mr. Lane. Thank you, Your Honor. Mr. Trio, you have two minutes. Thank you, Your Honor. So under the totality of circumstances, what would have been very important for the judge to look at is on page 402 of the record, which is the actual co-worker, Mr. Dave Shang, who was the secretary of disciplinary examination committee, and that's on the first three lines, and then lines 18, 19, and 20, where he affirms that Mr. Lee told me about the corruption of Mr. Han. And after investigation, it was found to be true. So here this was never addressed as any part of the record by the judge, and it was admitted as evidence, as well as on page 633 to 630, which the Public Security Administrative Bureau had a penalty determination, and it was based on where he worked and what he did and how he was trying to formulate a protest. This is another document that was not considered under the totality of circumstances, and if so, would corroborate what actually had happened in discovering this actual corruption. And on top of it, page 633, is the disposition and dismissal of Mr. Lee based on exactly what he had did, again, that he was trying to gather and have illegal gatherings and went to city government, and that he was fired because of this. So these are two also, these are several, these are three other pieces of evidence that were never addressed under the totality of circumstances, which do support what he was doing. And as well as his testimony, it was consistent, so it is compelling enough to remand this case back down for further evaluation of all of the evidence, because to do so contravenes the Real ID Act. Thank you. Thank you very much. We thank both counsel for their helpful arguments this morning, and the case is submitted, and we are in recess until tomorrow. Thank you both for the page numbers. Thank you.
judges: KLEINFELD, MILLER, COLLINS